**UNITED STATES of America,
Plaintiff,**

v.

**NATIONAL DAIRY PRODUCTS COR-
PORATION, Defendant.**

**No. 20542.**

United States District Court
W. D. Missouri, W. D.

Jan. 10, 1967.

Thomas S. Howard, James E. Mann, Robert Eisen, Raymond P. Hernacki, Antitrust Div., Dept. of Justice, Chicago, Ill., for plaintiff.

John T. Chadwell, Chicago, Ill., Martin J. Purcell, Kansas City, Mo., for defendant.

MEMORANDUM OPINION AFTER
SUPREME COURT REMAND TO
GIVE FURTHER CONSIDERA-
TION TO THIS CASE IN LIGHT
OF Dennis v. United States, 384 U.S.
855, 86 S.Ct. 1840, 16 L.Ed.2d 973

JOHN W. OLIVER, District Judge.

Pursuant to the mandate and per curiam opinion of the Supreme Court in National Dairy Products Corp. v. United States, 384 U.S. 883, 86 S.Ct. 1913, 16 L.Ed.2d 995, we have given further consideration to this case in light of Dennis v. United States, supra. Our findings of fact and conclusions of law are stated in this memorandum opinion. For reasons we state in detail, defendant's postmandate motion for new trial is denied. What we believe is an appropriate order is entered at the conclusion of this memorandum opinion.

I. Summary of Defendant's Postmandate
Motion for New Trial

As a part of the postmandate proceedings, defendant filed a motion of record "in order to formalize defendant's motion for new trial, and the grounds therefor, as heretofore set forth in its briefs." [1]

That postmandate motion asserts two grounds in support of new trial. In regard to its first ground, defendant alleged:

As its first ground for a new trial, defendant states that government counsel, at the trial of this case, pursuant to leave of Court, utilized portions of the prior testimony of the following witnesses before the grand jury for the stated purpose of refreshing their recollections: Arthur Augenstein, John Flanagan, Frank Gardner, John W. Baird, David W. Stewart, Vincent Crimmins and Edward H. Gilmore (sometimes hereinafter referred to as "refreshment witnesses"). It is undisputed that in each instance, defense counsel moved to inspect the portions of the grand jury transcripts so utilized and all other portions concerning the same subject matter, and these motions were denied. The seven persons hereinabove listed were important witnesses at the trial and played important roles in the events at issue under the charges of the indictment (as set forth in defendant's briefs, including particularly Brief of Defendant on Remand dated September 16, 1966, pp. 15–17, and Appendix A thereto). By reason of these facts, defendant had a "particularized need" to inspect portions of the refreshment witnesses' grand jury testimony related to their testimony on direct examination at the trial, and other testimony relevant to the charges of the indictment, and denial of defendant's motions therefor constituted reversible error.

The second alleged ground of defendant's postmandate motion relating to "non-refreshment witnesses"—i. e., witnesses whose grand jury testimony was not utilized for the refreshment of the testimony of any trial witness—contains the allegation that:

Defendant's attorneys made no motion to inspect pertinent grand jury testimony of the non-refreshment witnesses inasmuch as government counsel did not utilize the same at trial for impeachment or to refresh recollection, and defendant's attorneys believed that they were precluded from inspecting said grand jury transcripts under the decisions of the United States Supreme Court in United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), and Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).[2]

1. That motion was filed November 9, 1966. Upon receipt of the mandate we ordered the parties to file appropriate briefs. We heard a full day of oral argument on October 7, 1966, during which leave for filing three more rounds of briefs was requested and granted. Defendant's postmandate motion was filed contemporaneously with defendant's last written brief.

2. It is to be noted that defendant admits that the government did not use the grand jury transcript for "impeachment" of the

It was also there alleged that:

> As its second ground for a new trial, defendant states that government counsel had access to the ground jury transcripts of numerous other important prosecution witnesses (hereinafter sometimes referred to as "non-refreshment witnesses"), and understands that they utilized the same outside the courtroom in preparing said persons to testify against defendant.

Defendant then alleged that "the non-refreshment witnesses were in most cases hostile to defendant, and they gave testimony which was helpful to the prosecution and harmful to the defense, and defendant's counsel had no access to their grand jury testimony." The names of the non-refreshment witnesses, some thirty in number, were set forth and defendant alleged that its postmandate claim of "particularized need" was established by the alleged fact that all of those witnesses were, for various alleged reasons, hostile and adverse to the defendant's interest. Defendant then alleged that:

> Defendant is without knowledge as to whether or not impeachment material or material otherwise useful to the defense is contained in the grand jury testimony of the non-refreshment witnesses hereinabove listed, but avers that there is a reasonable possibility that said testimony contains impeachment material, including statements inconsistent with, explanatory of, or useful in placing in proper perspective their testimony given at the trial, or otherwise useful to the defense. Defendant further has no knowledge as to whether the grand jury testimony of the non-refreshment witnesses hereinabove listed contains material which might have been affirmatively helpful to the defense and, having been forgotten or concealed by said persons, was not called to their attention by government counsel; however, defendant believes there is a strong possibility that said grand jury testimony contains such material.

Defendant's legal contentions will be later stated in detail.

## II. Defendant's Contention in Regard to Command of the Supreme Court's Mandate is Untenable

As a preliminary matter it must be noted that the parties are in radical disagreement in regard to the meaning of the Supreme Court's per curiam opinion and its mandate commanding that this Court give this case "further consideration in light of Dennis v. United States."

Defendant contends that the only "logical * * * and indeed reasonable—explanation * * * that the Supreme Court sent its mandate to this Court [was that it expected this Court would] make the determination of whether the requested grand jury minutes were producible under the rules laid down in *Dennis,* and if so, to order a new trial—just as it would be required if the question involved the producibility of Jencks Act statements" (D.B. 10/28/66, p. 11).[3] Defendant insists that "the Supreme Court in effect directed [a new trial] in this case" (D.B. 11/18/66, p. 2). Defendant argued orally that the only reason the Supreme Court did not reverse *National Dairy* outright was because of the alleged existence of some sort of a general custom of courtesy that the Supreme Court

---

non-refreshment witnesses. It is not to be inferred from defendant's phraseology concerning the non-refreshment witnesses that defendant ever contended or that it now contends that the government attempted or in fact used the grand jury transcripts for "impeachment" of any refreshment witness. Defendant did not and can not on the facts so contend. As will be noted later, some of defendant's arguments attempt to ignore those established facts.

3. "(D.B. 10/28/66, p. 11)" refers to page 11 of the brief filed by the defendant on October 28, 1966. "G.B. 11/16/66, p. ——," for example, will refer to the government's brief filed on November 16, 1966. Inclusion of the date on which the various briefs were filed eliminates the more complicated system used by the parties.

allegedly extends to the lower federal court (O.A.Tr. 16–17).[4]

At the time of oral argument, we expressed the tentative view that if defendant's contentions in regard to what the Supreme Court actually held in *Dennis* were tenable then "the only reasonable thing for the Supreme Court of the United States to have done would have been to have simply reversed this case and sent it back for trial" (O.A. Tr. 38). Subsequent research and reflection has confirmed that tentative view.

The Court of Appeals for the Eighth Circuit recently received a similar remand from the Supreme Court in American Guild of Variety Artists v. Smith, 384 U.S. 30, 86 S.Ct. 1283, 16 L.Ed.2d 332. The original judgment of the Court of Appeals reported in 349 F.2d 975 was vacated and the case was remanded for further proceedings in light of United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. The Court of Appeals on remand, Smith v. American Guild of Variety Artists, Nos. 17856 and 17857, 368 F.2d 511, states that the Court of Appeals gave "careful consideration [to] the Supreme Court opinions in this case and *Gibbs*" with the understanding that "we are directed to apply the law as stated in *Gibbs* to our present case insofar as common issues are presented."

The Court of Appeals analyzed the rational of *Gibbs* and noted that reversal had been based primarily upon the Supreme Court's determination that the standard of proof prescribed by § 6 of the Norris-La Guardia Act had not been met. It also noted that the Supreme Court had full knowledge of the fact that the Court of Appeals had not considered § 6 in its prior opinion. The Court of Appeals then commented:

> If the failure to consider § 6 was error per se upon the record made whether or not the § 6 issue was properly before the Court, we would assume the Supreme Court would have reversed outright as it did in *Gibbs*. (Page 513 of Smith, Doing Business as Smith Entertainment Agency and as Smith & Dale Circus v. American Guild of Variety Artists, Nos. 17856 and 17857.)

The Third Circuit had much the same reaction to the Supreme Court's similar remand in Joines v. United States, 357 U.S. 573, 78 S.Ct. 1380, 2 L.Ed.2d 1547, in which it was directed to give further consideration to its earlier opinion reported in 246 F.2d 278, in light of Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514. In complying with the Supreme Court's mandate, the Third Circuit commented in its opinion on remand, reported as United States v. Joines, 3 Cir. 1958, 258 F.2d 471, that if the Supreme Court had considered a particular "decisive factor [to have been controlling] there would have been no purpose in remanding the case to us for further consideration." That case added that "[o]n the contrary, [had] the Supreme Court * * * thought this undeniable fact controlling, [it] would certainly have reversed the defendant's conviction" (258 F.2d at 472). Both the Eighth and Third Circuits adhered to their respective previous judgments. The Supreme Court denied certiorari in regard to the Third Circuit case. See Joines v. United States, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109. The Eighth Circuit case is probably on its way back to the Supreme Court.

In Henry v. City of Rock Hill, 376 U.S. 776, 84 S.Ct. 1042, 12 L.Ed.2d 79, the Supreme Court explained that its remand practice for further consideration in light of another particular Supreme Court decision, at least in the case of such remands to state courts, does not amount "to a final determination on the merits" (376 U.S. at 777, 84 S.Ct. at 1043). That case added that the practice is followed where the Supreme Court is "not certain that the case was free from all obstacles to reversal on an interven-

---

4. "(O.A. Tr. 16–17)" refers to pages 16–17 of the transcript of the postmandate oral argument heard October 7, 1966.

ing precedent" (376 U.S. at 776, 84 S.Ct. at 1043).

■ We therefore reject defendant's argument that the Supreme Court's mandate in effect required this Court to grant defendant a new trial.[5] We believe that the Supreme Court intended by its mandate that this Court give further consideration to this case in light of *Dennis;* that the principles and standards recognized and applied in *Dennis* be ascertained and applied to the factual and procedural situation presented by this case; and that a new trial be granted in the event, but only in the event, it is determined that reversible error was committed.

III. Defendant's Contention that *Dennis* Established New Standards That Rest on a Constitutional Base is Not Tenable.

We determine at the outset that neither *Dennis* nor *National Dairy* involve the Constitution. Defendant's argument to the contrary will be stated and answered before the questions presented by *Dennis* and by this case are discussed.

Defendant reiterated at oral argument that *Dennis* is a "landmark case." At oral argument, however, defendant contended that *Dennis* was a "landmark" case in the same sense that Brown v. Board of Education, (O.A.Tr. 17), Gideon v. Wainwright, and Douglas v. California (O.A.Tr. 18), are "landmark" cases (O.A. Tr. 19; cf. D.B. 9/16/66, p. 5 and D.B. 10/31/66, p. 3). Defendant also there argued, for the first time, that *Dennis* was based on constitutional grounds (O. A.Tr. 167). Requested permission to brief that question was granted (O.A. Tr. 168).

Defendant made clear in its post-oral argument briefs that it indeed "contends

that, under the Supreme Court's decision in *Dennis* \* \* \* denial to a defendant of his right to inspect a grand jury testimony of an important prosecution witness involves deprivation of his right to due process under the Fifth Amendment" (D.B. 10/28/66, p. 2). Defendant now argues that "not only does the Supreme Court's opinion [in *Dennis*] establish that a defendant has a right to inspect grand jury transcript when used by the prosecution at the trial, but by its specific reference to the Jencks Act it clearly imports that denial of that right constitutes reversible error, irrespective of any showing of inconsistency as between a witness' grand jury and trial testimony, or any other showing of prejudice" (D.B. 10/28/66, pp. 14–15). Defendant also contends that when the Supreme Court ruled *Dennis,* it ruled a question that was "somewhat similar" to that ruled in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (D.B. 11/10/66; see also D.B. 10/3/66, p. 4).

Recognition of the fact that existing standards were in fact applied in the trial of *National Dairy* required that defendant argue that "new standards [were] laid down in *Dennis* (D.B. 9/16/66, p. 19); that "the standards set forth in United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) and Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959) \* \* \* have been modified by the Supreme Court in *Dennis*" (D.B. 9/16/66, p. 17); and that the Supreme Court's action in this case plainly constitutes a rejection of *Socony-Vacuum* [United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129] as the rule for this case" (D.B. 9/26/66). In its post-

5. Defendant's argument as to the effect of the Supreme Court's mandate is most fully developed on pages 11 et seq. of Defendant's October 28, 1966 brief under the heading "This Court's Function on Remand is to Determine If the Requested Grand Jury Minutes Were Producible Under the Standards Laid Down in Dennis, and, If They Were, to Order a New Trial." The same argument is, however, threaded throughout various of defendant's other briefs. Cf. defendant's oral argument in which defendant's counsel argued that acceptance of the government's argument against granting a new trial "would lead Your Honor into what I think would be certain error in case—in view of what the Court has done in *Dennis*" (O.A. 153).

oral argument briefs, defendant argues that *"Dennis* overruled earlier decisions" [referring specifically to *Socony-Vacuum* and *Pittsburgh Plate Glass]"* (D.B. 10/28/66, pp. 20–21); that *"Socony-Vacuum * * * * is 'dead' [except for a single sentence quoted in *Dennis]"* (D.B. 10/28/66, p. 21); that "the issuance of the Court's *Dennis* opinion reflects adoption by a unanimous Court of the minority opinion in *Pittsburgh Plate Glass"* (D.B. 10/28/66, p. 23); and that Cox v. United States, 8 Cir. 1960, 284 F.2d 704, "to the extent, if any, that it implies that the trial court has discretion to deny disclosure of pertinent portions of grand jury transcript used by the prosecution for refreshment, it must be deemed in conflict with *Dennis* and *pro tanto* overruled" (D.B. 10/28/66, p. 24).

Appropriate recognition must, of course, be given *Dennis'* specific teaching in regard to the relative weight that should be given by federal trial judges to the competing policy considerations of secrecy and disclosure implicit in Rule 6 (e) of the Rules of Criminal Procedure. Appropriate recognition must also be given the broader and more general impetus that *Dennis* gives to the development of the concept that disclosure will ordinarily promote the proper administration of criminal justice in the courts of the United States. But recognition of those principles does not support defendant's basic argument that *Dennis* must be viewed as a "landmark" case in the sense that defendant argues. *Dennis* was not based on the Constitution. Nor did *Dennis* establish new principles or standards different from those long established by the earlier Supreme Court cases. *Dennis* applied existing standards to the particular factual situation presented by that case.

Our rejection of defendant's argument that *Dennis* rests upon constitutional grounds does not suggest that we reject the idea that the Supreme Court decisions that concern the application of rules of criminal procedure do sometimes, if not inevitably, carry constitutional overtones. Indeed, a lack of understanding or a gross misapplication of procedural rules,

including the clear abuse of discretionary power conferred by them, calls into play familiar constitutional concepts of fair trial. Mr. Justice Brennan's comment on *Jencks'* discovery [Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L. Ed.2d 1103] rationale in his concurring opinion in Palermo v. United States, 360 U.S. 343, at 362, 79 S.Ct. 1217, at 1230, 3 L.Ed.2d 1287, says about as much as can be said generally on that subject. "It is true," Mr. Justice Brennan there said, "that our holding in *Jencks* was not put on constitutional grounds, for it did not have to be; but it would be idle to say that the commands of the Constitution were not close to the surface of the decision; indeed, the Congress recognized its constitutional overtones in the debates on the statute."

But to say that the commands of the Constitution are close to the surface and that a sensitive ear can hear constitutional overtones is not to say that the light given the federal trial courts by *Dennis* in regard to how the Supreme Court now believes those courts should exercise their discretion in administering Rule 6(e) of the Rules of Criminal Procedure is commanded by the Constitution of the United States. Nor is it to say that *Dennis'* acceleration of the development of broader disclosure practices and procedures in the administration of criminal justice in the courts of the United States is based on constitutional grounds. We therefore reject defendant's argument that *Dennis* is based on constitutional grounds.

## IV. Factual Situation Presented in *National Dairy*.

Defendant National's motion for judgment of acquittal, notwithstanding the verdict and, in the alternative, for a new trial as to Counts One through Ten (File IX—1627–1633) did not in any way suggest that any error was committed in regard to those counts of the indictment in connection with the use of any portion of grand jury transcripts. Grand jury transcripts were not even mentioned in that motion directed to Counts One through Ten.

Defendant National's similar post-trial alternative motion for judgment of acquittal n. o. v. and for new trial as to Counts Eleven, Twelve and Thirteen (File IX—1634-1645) alleged in paragraphs 10 and 11 as follows:

10. The Court erred in overruling defendants' motions to be permitted to inspect those portions of the Grand Jury transcript used by the Government to refresh the recollection of witnesses Flanagan, Crimmins, Gilmore, Augenstein, Gardner, Baird and Stewart and to inspect those portions of such transcript which related to the same subject matters.

11. The Court and Government counsel made improper use of the Grand Jury transcript. (IX—1636).

That motion reflects that defendant National's trial complaint was made in connection with only three counts of the indictment. And defendant's trial complaint in regard to those three counts was limited to the ground that the defense was not "permitted to inspect those portions of the Grand Jury transcript used by the Government *to refresh the recollection* of [seven particular] witnesses and to inspect those portions of such transcript which related to the same subject" and the complaint that "the court and Government counsel made improper use of the Grand Jury transcript" in that regard. (Emphasis ours).

No defense attempt was made at trial to show any "particularized need." Defendant simply insisted that it had a right to see the grand jury questions and answers that it heard read in open court under the supervision of the Court and to see portions of the grand jury transcript viewed by the trial judge in the course of its *in camera* examination conducted to prevent abuse of permitted refreshment use of the grand jury transcript.

Defendant did not attempt to show at trial, nor did it contend at trial that it had established any "particularized need" for any additional production, disclosure, or defense inspection of the grand jury transcript. In footnote 20 on page 22 of its October 28, 1966 brief, defendant

concedes that we accurately noted in our post-trial opinion (231 F.Supp. at 667) that defendant had claimed at trial only an "absolute right" to examine. The Court of Appeals' accurate statement of the trial procedural posture of this case underlines defendant's reason why the defendant must now argue that *Dennis* holds that a defendant is entitled to claim the government's *showing* of "particularized need" as his own. The Court of Appeals stated:

Counsel for National and Wise, apparently recognizing that grand jury minutes, under proper circumstances, may be used for the purpose of refreshing the recollection of witnesses, offered no objection to the procedure envisioned by the court. They did, however, move unsuccessfully for the privilege of examining the portions of the grand jury transcript which the Government intended to use. Neither does appellant, on this appeal, dispute that the Government was entitled to use the grand jury transcript for refreshment purposes. Rather, it contends that the court permitted Government counsel to use the grand jury testimony for impeachment purposes and as substantial evidence and, therefore, that the court erred in denying its motion to inspect the transcript. (350 F.2d at 330-331).

The Court of Appeals, we believe, correctly determined that:

The record does not support the argument that the grand jury testimony was used for impeachment purposes or as substantial evidence and no objection of either nature was made during the trial. (350 F.2d at 331).

The Court of Appeals decided that, while it would have been justified in declining to consider defendant's assignment of error that the grand jury testimony had allegedly been used for impeachment purposes, it nevertheless considered that contention on the merits (350 F.2d at 331). In so doing it held that:

Use of the grand jury testimony was limited to the stated purpose of refreshment, in strict conformity with

the court's instructions. (350 F.2d at 331).

The Court of Appeals thus definitely held that *National Dairy*, on its facts, presented a question that related solely to the use of portions of grand jury transcript for refreshment purposes only. That court determined prior to *Dennis* that the record did not support any contention that the grand jury testimony was in fact used for impeachment purposes. That court determined that defendant did not in fact object at trial to any alleged impeachment use of the grand jury testimony. So far as this Court is concerned, our re-examination of this case in light of *Dennis* requires that we note our agreement with the original findings and conclusions stated by the Court of Appeals. There was no prior occasion for this Court to make specific findings or state our conclusions on those questions because the defendant did not present the same argument to this Court that it later presented to the Court of Appeals. See 231 F.Supp. at 667.

The factual data upon which we base our findings concurring with those made by the Court of Appeals can be most conveniently stated by directing attention to the pages of the trial transcript that reflect the establishment and application of the refreshment procedure followed in the trial of *National Dairy*.

The question of how refreshment use of the grand jury transcript would be permitted first arose after we had determined that the government had made its first showing of "particularized need" for the refreshment of the recollection of witness Flanagan. During the discussion of that question defense counsel advised the Court that the defense wanted to be protected from the possible abuse that the government might select for refreshment use only "one excerpt from the [grand jury] record" that might not fairly reflect what "all excerpts in the [grand jury] record of this witness" might show (Tr. 426). Defense counsel stated:

> Certainly if the witness has said something that should be used to re-

fresh his recollection, and I am sure he would be the first to want to have it, but the problem that I always have in this thing is, the Government decides what they are going to show him to refresh his recollection and I have never—I am never sure whether they are showing him one statement that may be qualified, modified or changed later on or not, and I think they have it within their power to represent to the Court that this is everything the witness said on the subject whether it appears in one place or fifteen places in the testimony. (Vol. 4, Tr. 426–427).

Counsel for the defense was willing to accept government counsel's representation in regard to what a particular witness had said on a particular subject "to save the Court the burden of going through the whole thing [to determine] this is all the man said on the subject" and agreed that "the Court ought to see it before I do" (Tr. 427). Defense counsel made clear that he eventually wanted to see the questions and answers that the government intended to use for refreshment purposes and also wanted to see the other portions of the grand jury testimony where the particular witness may have testified on the same subject that the Court would view *in camera* (Tr. 427).

Government counsel opposed the last step of the procedure suggested by the defense, pointing out that refreshment was the only use to which the disclosed grand jury testimony would be put, adding "it is not a question of using it for impeachment purposes, we do not purpose to do that" (Tr. 428).

We indicated our agreement with defense counsel's suggestion that a particular witness might unfairly be confronted with an inadvertent expression made in a particular question and answer; stating, for an example, the fixing of a particular date that might be reflected that would, within a matter of two or three later questions be identified as an error. We stated that all possibilities of such a mistake in the grand jury testimony must be explored and that "the real testimony

must be developed by reading on the four corners of the witness' testimony" (Tr. 434). We therefore required that the government, "in accordance with Mr. Chadwell's suggestion, designate all testimony before the grand jury relating to the subject matter on which counsel wish to refresh the witness' recollection" (Tr. 435).

In accordance with that established refreshment procedure, we directed that the government furnish the Court with a memorandum for each particular witness which designated all anticipated grand jury questions and answers to which the witness might have his attention directed for refreshment purposes, together with a citation to all other pages of the grand jury transcript where additional testimony may have been given on the same subject by the same witness.

Such memoranda were in fact and from time to time filed in connection with each of the refreshment witnesses as each was called to the stand. In each instance, and shortly before each particular refreshment witness testified, we read all of the pages of the grand jury testimony cited; determined *in camera* whether the questions proposed to be asked a particular witness were or were not, in our judgment fairly calculated to refresh the particular witness' recollection; and ruled in advance of the witness' direct or cross-examination whether the particular questions could or could not be asked for refreshment purposes. The various memoranda were entitled "Refreshment of recollection of [name of the particular witness]" and appear on pages 1194 to 1219 of File VIII of the trial court rec-

ord.[6] The Court of Appeals stated on page 332 of 350 F.2d that the defendant, as an appellant in that court, took the position on appeal that "[n]ot until perfection of this appeal did [it] learn that the 'citations' furnished to the court *. * * included a legal memorandum, and * * * material other than citations to the grand jury transcript." We believe this matter should be clarified.

It must be understood that the government did not file all the refreshment of recollection memoranda simultaneously. Each was filed immediately before a particular witness was put on the stand and it was mere happenstance that the Clerk filed all the memoranda consecutively in the same file. The government's legal memorandum entitled "Memorandum of the United States concerning the use of grand jury transcript to refresh the recollection of a witness" also happened to be filed by the Clerk immediately preceding the refreshment of recollection memoranda. That legal memorandum shows on its face that it was dated June 17, 1963. It was used by government counsel in the presentation of his argument at the conference held at the end of the day of June 17, 1963 when the refreshment question first arose (Tr. 432). The record shows that defense counsel had also prepared and used a similar legal memorandum on that subject to which he made reference in the course of that conference (Tr. 425; 438). We did not notice and do not now know whether government counsel served a copy of that legal memorandum on the defense. If they did not, they should have, even though the leading cases cited in that

6. Examination of those pages in File VIII of the record shows that Refreshment Memoranda were presented to the Court not only in connection with the seven particular witnesses whose recollection the government sought to refresh, but were also presented with respect to witnesses (8) Callender, 3 possible refreshment points (VIII, 1204–1205); (9) Gibb, 9 possible points (VIII, 1209–1212); (10) Isaacs, 4 possible points VIII, 1213–1214); (11) Martin, 3 possible points (VIII, 1215); (12) Clark, 3 possible points (VIII, 1216–1217); and

(13) Heyer, 9 possible points (VIII, 1218–1219). No occasion for refreshment arose during the testimony of any of this group of witnesses. Our handwritten notations on each of the memoranda for this group of witnesses shows that we had studied the grand jury transcripts *in camera* and that we were prepared to rule if a particularized need for refreshment had been shown by the government. The grand jury testimony of all thirteen witnesses reviewed in the separate *in camera* examinations will be included in our final order.

memorandum were fully discussed at the conference.

Counsel for the defense was not under any obligation to serve their brief on counsel for the government because defense counsel did not give a copy of their brief to the Court. As was noted in our opinion on the post-trial motions, defense counsel did not file any grand jury brief with this Court until March 11, 1964, months after the jury had returned its verdict. See 231 F.Supp. at 667.

On Tuesday morning, June 18, 1963, the trial day following the afternoon conference at which the refreshment procedure was established, we stated to counsel in chambers:

> Gentlemen, on the record, following our conference after we excused the jury yesterday, the Government furnished me the citations to the Grand Jury testimony concerning John Flanagan, both as to the material that the Government would desire to use for purposes of refreshment, and also marking all portions of the Grand Jury record where testimony was taken relating to the same topic, and also a notation of where Mr. Flanagan testified in entirety during the Grand Jury proceedings.
>
> I have reviewed the first two topics verbatim; I have scanned his full testimony. I am satisfied that the portions of the Grand Jury transcript marked in red, which the Government indicates they would use for the purposes of refreshment, is entirely consistent with all testimony given by Mr. Flanagan when he was examined about the same topic, and that the portions selected by the Government is that portion which most sharply gives the witness' testimony in the fewest number of questions and answers.
>
> As I indicated at the close of the day yesterday, I will permit the Government to use the transcript for purposes of refreshing Mr. Flanagan's recollection, but only for that purpose. I will make clear to the jury that the testimony given before the Grand Jury is not to be considered as affirmative

evidence in this case, but that it is solely for the purpose of refreshment. (Vol. 5, Tr. 445–446).

Defense counsel, shortly after that statement, made the following oral motion:

> MR. CHADWELL: Your Honor, I move for the privilege of examining the portions of the transcript which Mr. Jinkinson has marked and submitted to Your Honor. (Tr. 447).

After being advised that we were going to experiment with the procedure; that we would get a bit of experience in connection with witness Flanagan; and that defense counsel should feel free to renew his request because the Court, either on his request or its own motion, would want to change the procedure if complete fairness was not being maintained to all parties, defense counsel stated:

> MR. CHADWELL: I just want to point out to Your Honor that, of course, I do not know what the transcript reveals, and if I did know, I think, would make is easier for me to handle any questions that might be asked or handle any cross-examination on this point. I do not know whether that will be necessary or not, of course, at this time. (Tr. 448).

Before Mr. Flanagan took the stand, we instructed the jury both as to the procedure being followed and of the law regarding refreshment of recollection. The following portions, omitting examples given, are illustrative of that explanation and instruction:

> Members of the jury, as I explained last night, we reached a question that might be a recurring question during the course of trial. The Court worked with counsel for both sides after you were excused and worked again this morning to establish the procedure under which a particular witness' recollection may be refreshed by having his attention directed to testimony that he gave at an earlier time before the grand jury that was considering the question of whether or not

the charge should be made by way of indictment against the defendant in this case.

I want to explain to you at this point what the law means by refreshing a witness' recollection. * * *

The important thing for the jury to keep in mind is that whatever document may be used to refresh a witness' recollection, whether it is a telephone book, whether it is a letter that he may have written, whether it is transcribed testimony before a grand jury, the particular document that is used for that purpose is not to be considered by you as affirmative evidence in this case. It is merely used for the purpose of refreshing the witness' recollection. The witness' recollection may be refreshed, and if it is, he will say so.

* * *

The point that I want to underline is that regardless of what may be used for the purpose of refreshing a witness' recollection is not to be considered as affirmative evidence in this case, and that the evidence in that case that you shall consider is the testimony given by the witness on the stand.

Of course, if he says, "This does refresh my recollection, I remember giving that testimony, I remember that it was fresher in my mind at that time, and I do recall that I said that, and I know that I was telling the truth at the time, and I can now say that my recollection is refreshed and my present testimony is in accordance with that which I testified to earlier."

If he testifies that way, that is evidence in the case. If, on the other hand, he listens to the question and answers and says, "I am sorry, that doesn't help," then you are not to consider the questions and answers that he gave before the grand jury as evidence in this case. (Tr. 449-452).

How the procedure was followed is illustrated by its use with Mr. Flanagan. Page 453 of the trial transcript shows that government counsel, after having been advised of our ruling made after our

*in camera* inspection, read a series of questions and answers from pages 1673-1674 of the grand jury transcript in an effort to refresh the recollection of witness Flanagan. That citation to the grand jury transcript had been given the Court at the bottom of the "Refreshment of Recollection of John Flanagan" memorandum under the heading "Material Desired for Refreshment." See File VIII-1194. As had been stated of record (Tr. 445-446), we had already studied that portion of the grand jury transcript, together with the other references cited under the other heading "Other Material Relating to the Same Topic."

At the time the questions and answers were read to the witness we had before us the grand jury transcript and followed the reading of the questions and answers, word for word, in order to make certain that through inadvertence, the witness was not unfairly treated by an inaccurate reading. The pencil notation at the bottom of the Flanagan refreshment memorandum: "#6 p. 1628-1630—Banfield preparation of two price studies" was a note I added to reflect one additional citation given me orally during the noon hour by government counsel.

At the beginning of the afternoon session the following occurred out of the presence of the jury:

THE COURT: I want to advise counsel for the defense that during the noon hour, counsel for the Government handed me a note designating Pages 1628 to 1630 in the same pattern as those directed this morning. I want to assure counsel that I have studied the grand jury transcript that appears on those pages, and will permit Government counsel to attempt to refresh this witness' recollection by the reading of those pages.

I wanted to be sure that counsel understood that I had studied those and that was the purpose of coming here.

MR. CHADWELL: I appreciate your comment, Your Honor. This is in addition to what the Government had shown you before Court opened this morning?

THE COURT: That is correct.

MR. CHADWELL: I want to renew our motion, Your Honor, and discuss it with the Court, but perhaps it would be better to wait until counsel is finished with this witness, because for all I know, they have some other sections of the transcript to read to him and I have got something I wish to say to the Court with respect to all of them. (Vol. 6, Tr. 533)

When Mr. Flanagan left the stand, we stated:

THE COURT: Before the witness is excused, I would like to again direct the jury's attention to the fact that in connection with some six questions, various questions and answers from the Grand Jury testimony were read. I will again remind you at the end of the case that the questions and answers in the Grand Jury testimony were read for the purpose of attempting to refresh this witness' recollection. I repeat, that those questions and answers from the Grand Jury transcript are not to be considered as affirmative evidence against either defendant in this case.

You will recall when I give you the final charge, that I have spoken to you twice about this matter, and I will again call it to your attention at that time and I hope it will refresh your recollection as to how this procedure was followed and how it is to be treated by you. (Tr. 564).

On the following morning, the following occurred:

THE COURT: Mr. Chadwell, at the informal conference last night, we both recalled that you had reserved the right to make a motion for the record in regard to the grand jury transcript, and before we all forget it, I wanted to give you that opportunity this morning to make a motion for the record.

MR. CHADWELL: Thank you, Your Honor. I would like to move, and do move, for the right to inspect the grand jury transcript of the testimony of Mr. Flanagan, who testified yester-day with respect to all matters that were inquired into by Government counsel in the questions designed to attempt to refresh his recollection, not only the questions and answers which were read to him but all other portions of the testimony relating to the subject matter thereof.

I want to make it clear I am not asking to go beyond the subject matter of the questions and answers which were actually read to the witness, but I felt that I was unable properly to evaluate his testimony in the absence of the complete transcript on those points.

THE COURT: Let the record show that the defense motion will be denied.

The record should also show that the Court read all of the testimony given in regard to a particular subject in regard to all of the questions and answers used for the purpose of refreshing witness Flanagan's recollection, and that I also checked word for word the Government's reading of the particular questions and answers during the course of Mr. Flanagan's examination. The reading was accurate, word for word.

On another matter the Government has submitted a similar list in regard to possible refreshment of the recollection of the witness Vincent Crimmins about 9:30 this morning, and between 9:30 and now, I have read all of that testimony, both marked in black and in red, as the procedure was outlined earlier in the record, so that it will not be necessary, when and if it becomes necessary to [refresh] and I take time to read it, but I want to assure counsel that I have read it and will again follow word by word any questions and answers that it might be necessary to read in connection with the refreshment of the witness, Vincent Crimmins.

MR. CHADWELL: May I make a statement to Your Honor?

THE COURT: Yes.

MR. CHADWELL: I have no doubt that Your Honor has done just that, and I appreciate that, but nevertheless

we urge the motion with respect to the grand jury transcript read to Mr. Flanagan and I now wish to move for the right to inspect the transcript of the witness, Mr. Crimmins, about which Your Honor has just spoken, and I would like to inspect not only what the Government will read to him but also other portions of the transcript dealing with the same subject matter, and the reason is not that I in any way doubt that the Court has inspected it and will watch to see that the questions are accurately read but in order that I may—or counsel for the Defendants may properly evaluate the transcript and the portions read to the witness, and be better able to cross-examine the witness on the testimony.

THE COURT: The Court will make the same ruling in connection with that motion. (Tr. 610–612).

As noted by the Court of Appeals, counsel for the defense "offered no objection to the procedure envisioned by the court" (350 F.2d at 331). The most defense counsel ever indicated they wanted was inspection of the questions and answers to be read and of the other portions of the grand jury transcript relating to the same subject matter that had been examined *in camera*. Counsel for the defense never spelled out with particularity why he felt it necessary that the defense inspect those portions of the grand jury testimony, except as quoted above. We find it obvious that the only purposes that could have been served would have been to enable the defense to express its view on the question of whether the defense believed the particular questions and answers in the grand jury transcript marked by the government would or would not, in the opinion of the defense, be likely to refresh the recollection of the particular witness and to enable the defense to comment on the question of whether the trial judge had correctly determined *in camera* that those questions and answers were fairly chosen in light of all the witness' grand jury testimony on the particular subject.

One additional purpose would have been served—defense counsel would have been able to check whether the Court had in fact effectively checked whether government counsel correctly read the particular questions and answers that the Court permitted to be disclosed for refreshment purposes alone.

Defense counsel, of course, were aware of all the refreshment questions and answers actually disclosed and used because they heard them read in open court. When defense counsel renewed their motion to inspect on page 1004 of the transcript, for example, it was stated that "the defendants be permitted to inspect and examine and be aware of not only those marked by the government and to be read the witness, but those relating in any way to such portions." When any defense counsel indicated he had not heard clearly, the question or answer from the grand jury transcript was re-read (Tr. 534); questions as to whether descriptive matter appeared in the grand jury transcript were promptly and accurately answered (Tr. 642); and, when required, we advised the witness of the context in which particular grand jury testimony was given (Tr. 826).

Our postmandate examination and detailed comparison of the record with the grand jury transcript used in connection with the examination of each of the seven refreshment witnesses shows that such a check was not necessary. That comparison shows that in each instance involved, the counsel for the government accurately read the grand jury questions and answers to each witness on every occasion that refreshment use was permitted.

■ While we made numerous determinations at trial of "particularized need" on motion of the government, our orders of disclosure were limited to use for refreshment purposes only and were so ruled. Familiarity with *Socony-Vacuum, Pittsburgh Plate Glass* and the decision of the Eighth Circuit in Cox v. United States at the time of the conference relating to the establishment of the refreshment procedure is a matter of

record (Tr. 432). In spite of the fact that the contemplated refreshment use of the grand jury transcript was precisely within the scope of *Socony-Vacuum*, we believed that the possibilities of abuse suggested by the defense were real and that appropriate regulation of the refreshment process was required by *Socony-Vacuum* and general considerations of fair trial. The safeguarding procedures above described were accordingly directed and followed and the jury was instructed throughout the trial and in our final charge that if a particular witness testified that his recollection had not been refreshed, the jury was not to consider the questions and answers read from the grand jury transcript as evidence in the case. We recognized at trial, as the Court of Appeals subsequently determined (350 F.2d at 331), that the defense would have been prejudiced if the jury had been permitted to consider the grand jury testimony as substantive evidence. We believe that our repeated instructions in that regard fairly and adequately protected the defendants' interests. The Court of Appeals was of the same judgment. See 350 F.2d at 331–332.

The citation by both the majority and dissenting opinions in Pittsburgh Plate Glass Co., (360 U.S. at 401 and 410, 79 S.Ct. at 1241 and 1246, respectively), of United States v. Spangelet, 2nd Cir. 1958, 258 F.2d 338, played its part in the trial of *National Dairy*. The safeguarding procedure described in Spangelet and other Second Circuit impeachment cases, although involving a different factual situation than that presented in *National Dairy*, nevertheless contained the seed for the *in camera* examination part of the procedure designed and followed for refreshment use of the grand jury transcript in the trial of this case. The design of the refreshment procedure in *National Dairy* was also influenced by our knowledge of the procedures established for the National Deposition Program in the electrical antitrust litigation described in Atlantic City Electric Company v. A. B. Chance Company, (C.A.2d Cir.1963) 313 F.2d 431, at 433, later to be cited with approval in *Dennis*, in footnote 15 on page 870 of 384 U.S., on page 1849 of 86 S.Ct.[7]

## V. Further Consideration of *National Dairy* In Light of *Dennis* Must Take Into Account The Factual Context of Each Case

*Dennis*, on its facts, involved an impeachment situation in which the trial court and the Court of Appeals had assumed, without either court making any examination of the grand jury minutes to ascertain the actual fact, that nothing in the grand jury testimony would be of impeaching significance in a case in which the probabilities were obviously to the contrary. *Dennis* emphasized that the particular factual situation of that case must be said to have established a "particularized need" within the meaning of well established and existing Supreme Court standards because (1) "there was reason to assay the [trial] testimony * * * against the much fresher testimony before the grand jury;" (2) because "[t]he charge could not be proved on the basis of evidence exclusive of that here involved;" (3) because the testimony concerning "conversations and oral statements made in meetings * * * was largely uncorroborated" and the question of guilt or innocence could have turned on exactly what was said; (4) because the witnesses involved were in categories long suspect, such as accomplices, including a paid informer and one other witness had obvious reasons for hostility; and (5) because one of the witnesses admitted on cross-examination that he had been mistaken about significant dates (384 U.S. at 872–873, 86 S.Ct. at 1850–1851).

*Dennis* held on those particular facts that "we cannot accept the view of the

---

7. For further influence on this Court of the National Deposition Program of the electrical antitrust litigation in regard to disclosure of grand jury minutes in antitrust litigation generally, see United States v. Max Factor & Co., W.D.Mo. 1966, 39 F.R.D. 3.

Court of Appeals that it is 'safe to assume' no inconsistencies would have come to light if the grand jury testimony had been examined. There is no justification for relying upon 'assumption' " (384 U.S. at 874, 86 S.Ct. at 1851). The focus of *Dennis,* as had been the earlier focus of *Procter & Gamble* and of *Pittsburgh Plate Glass,* was on an impeachment situation.

*National Dairy,* on its facts, involved a radically different factual situation; a refreshment, not an impeachment situation, was presented. In *National Dairy,* the grand jury transcript was ordered produced and, upon the government's several showings of "particularized need" in connection with seven particular witnesses, particular portions of the grand jury testimony was ordered disclosed solely for refreshment use. The government's showings of "particularized need" and motions for disclosure were so limited (Tr. 428).

At the time of the trial of *National Dairy,* the defense never so much as intimated that it desired or could, in fact, make any showing of "particularized need" of any sort, including a need for the impeachment of any of the seven refreshment witnesses. The defense asserted no claim that inconsistencies might exist between the grand jury and trial testimony of any of the seven witnesses involved. The only requests ever made by the defense were (1) that it be permitted to inspect the grand jury testimony that was in fact disclosed for refreshment purposes only, and (2) to see the other portions of the transcript that related to the same subject matter that had been examined by the trial judge *in camera.*

Trial error was assigned in *National Dairy's* posttrial motion in connection with only three counts of the indictment; that alleged error was based solely on the ground that the defense had not been permitted inspection of the portions of the grand jury transcript just described. The defense did not contend at trial that *National Dairy* was an impeachment case or that anything except refreshment use was in fact permitted of the grand jury testimony.[8] Nor does the defense now make those contentions. Defense counsel made this clear at the postmandate oral argument. It was there denied that the defense had ever raised at trial or was now attempting to raise any point that "the Government was impeaching the seven witnesses" (O.A.Tr. 187). Defense counsel added that "we are basing our argument not on impeachment but on attempts made at refreshment. That was my whole argument. I didn't say anything about impeachment" (O.A.Tr. 188).

■■ The considerations that relate to the initial production of documentary evidence in the government's possession, including grand jury transcripts; the purposes to be served by the required *in camera* examination by the trial judge; and, dependent upon the facts of each particular case, the reasons that require eventual disclosure to the defense in a case involving an impeachment situation are not automatically applicable to a case involving a refreshment situation. In a case involving potential impeachment, such as *Dennis,* every consideration of fairness requires and dictates that all possible doors to truth be unlocked and that all available data in the government's possession in which inconsistencies may exist in fact be produced, first, for *in camera* inspection by the trial judge and finally that such data be disclosed to the defense, assuming that inconsistencies do in fact exist, for impeachment use by it. The principles and standards established and recognized by the earlier Supreme Court cases applied in *Dennis* make certain that such must be the rule

---

8. Paragraph 10 of defendant's motion for new trial, confined solely to Counts Eleven, Twelve and Thirteen, expressly alleged that the government had used the grand jury transcript "to refresh the recollection" of the seven witnesses involved. That motion's assignment of error was limited to the trial court's refusal to permit defense inspection of the refreshment data; it did not in any way claim or suggest that the grand jury transcript had been used for impeachment purposes.

unless clear and compelling considerations oppose such production and eventual disclosure to the defense of impeachment data in the government's possession.

■ The Supreme Court has long made it obvious that in an impeachment situation the defense, and not the trial judge, should decide what the defense, subject to the usual rules of evidence, should use in its impeachment effort. *Dennis* obviously does not command that the trial judge in *National Dairy* should have in effect become co-counsel for the defense. Neither *Dennis* nor any other case or authority with which we are familiar has ever held or suggested that a federal trial judge is under duty, the violation of which is reversible error, to order defense counsel to file a motion requesting that the trial judge conduct an *in camera* inspection to determine whether inconsistencies exist between a witness' trial and grand jury testimony. Indeed, we believe it would have been improper for us to have inquired at the trial of *National Dairy* whether defense counsel had considered filing some motion that we might have filed had we been defense counsel instead of the judge in the case. As the Court of Appeals noted, both sides were represented by "highly competent and skilled advocates" and "[t]his prosecution has produced a history of every conceivable motion and numerous legal memoranda" (350 F.2d at 338). The fundamental principle underlying *Dennis'* suggestion that "[i]n our adversary system, it is enough for judges to judge" (384 U.S. at 875, 86 S.Ct. at 1851) is directly applicable.

■ Nor does *Dennis* suggest, indeed, it negates, the notion that disclosure for disclosure's sake is a new and automatic rule to be followed by federal trial judges and that such things as the filing of appropriate motions, the showing of particularized need, and compliance with all aspects of the approved and established trial procedures that relate to impeachment are things of the past.

Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953) emphasized long before *Jencks* or *Dennis* that concepts of fairness require the production of documentary evidence in the government's possession that might be useful *"to impeach* the testimony of a prosecution witness" (344 U.S. at 415, 73 S.Ct. at 371, emphasis ours). In spite of all the temporary uproar caused by *Jencks*, that case extended but slightly the holding of *Gordon*. *Jencks*, like *Gordon*, was focused on an impeachment factual situation. *Jencks*, like *Gordon*, before it and *Dennis* after it, recognized that after production permits a case for disclosure to be made, the defense is then, but only then, entitled to inspect and to use as it sees fit. *Jencks* held that "the petitioner is entitled to inspect the reports to decide whether to use them in his defense" because "only the defense is adequately equipped to determine the effective use for purpose of discrediting the Government's witness and thereby furthering the accused's defense" (353 U.S. at 668–669, 77 S.Ct. at 1013).

The question of policy that relates to the production of impeachment documents in the possession of the government for eventual use by the defense presented by *Pittsburgh Plate Glass* was infinitely more complicated than that presented in *Gordon* and *Jencks;* the particular document involved in *Pittsburgh Plate Glass* was a grand jury transcript. In that case the Supreme Court was required to determine the additional question of whether the long established policy of secrecy for grand jury transcripts was to be denied the weight that black letter law had given it. It is significant that all members of the Supreme Court in *Pittsburgh Plate Glass* were in agreement that grand jury transcripts must be treated specially and that something more than the ordinary policy considerations of secrecy versus disclosure must be considered when a grand jury transcript is the particular document that the defense wants produced for its ultimate examination and use for impeachment purposes.

Both the majority and minority opinions in *Pittsburgh Plate Glass* were agreed that neither *Jencks* nor the Jencks Act were applicable to a grand jury tran-

script. See 360 U.S. at 398 and 403, 79 S.Ct. at 1240 and 1242. Nor did the disagreement between the majority and minority in *Pittsburgh Plate Glass* relate to what principle should be applied to grand jury transcripts. The conflict in view centered primarily on whether, on the particular facts there involved, the defense had in fact sustained its burden of showing a particularized need for disclosure for impeachment use. The dissent's view of the facts was that only "lip service" had been paid principles long established by *Socony-Vacuum* and *Procter & Gamble*. The dissent was convinced that under the facts presented in *Pittsburgh Plate Glass,* the defense had not been "permitted every reasonable opportunity to impeach a government witness" and that "[o]bviously the impeachment of the Government's key witness on the basis of prior inconsistent or contradictory statements made under oath before a grand jury would have an important effect on a trial" (360 U.S. at 407, 79 S.Ct. at 1245).

The focus of *Dennis* like the focus of *Gordon, Jencks, Procter & Gamble* and *Pittsburgh Plate Glass* before it, was directed to particular factual situations in which production and later defense inspection was sought for impeachment purposes. *Dennis* applied and discussed exactly the same standards and principles that were established and applied in the earlier Supreme Court cases. *Dennis* simply determined that under the facts there presented "it cannot fairly be said that the defense has failed to make out a 'particularized need'" (384 U.S. at 872, 86 S.Ct. at 1850). *Dennis* in no way held that motions for production or showings of "particularized need" are no longer required. *Dennis* recognized an established principle when it suggested that

it is defense counsel's job—not the trial judge's job—"to pick out all of the grand jury testimony that would be useful in impeaching a witness" (384 U.S. at 874, 86 S.Ct. at 1851). *Dennis* could do no more than recognize that principle because at trial the impeachment procedure did not reach a point where that question could be presented. In *Dennis* the trial judge failed at the outset of the impeachment procedure to properly perform his duty either to order production of the grand jury transcript or to make an *in camera* examination of that transcript in order to determine whether impeachment data in fact existed. The trial judge in *Dennis* did not err in refusing to permit defense examination or defense use; he erred in refusing even to order production.

*Dennis* did not suggest that it was overruling any earlier Supreme Court case. Nor did *Dennis* even intimate that it intended to eliminate judicial supervision of the established trial procedures that have long regulated the production and subsequent disclosure of grand jury transcripts for impeachment use. *Dennis* did not purport to ban *in camera* examinations by the trial judge. The established Second Circuit *in camera* examination impeachment procedure, first noted by the Supreme Court in both opinions in *Pittsburgh Plate Glass* by their respective citation of United States v. Spangelet, 2 Cir., 258 F.2d 338 (360 U.S. at 399 and 401, 79 S.Ct. at 1240 and 1241) was again noted in *Dennis*. *Dennis* stated with approval that the *in camera* examination feature of that impeachment procedure "may be useful in enabling the trial court to rule on a defense motion for production to it of grand jury testimony" (384 U.S. at 874, 86 S.Ct. at 1851).[9]

9. In response to a direct inquiry (O.A. Tr. 114), the defendant took the position that this case does not involve any question concerning the application of the principles stated in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed. 2d 601; Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L. Ed.2d 453, and Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16

L.Ed.2d 882 (D.B. 10/28/66, pp. 2–4; D. Memo. 11/9/66, p. 102). In a letter dated November 30, 1966, however, defense counsel directed our attention to O'Connor v. Ohio, 385 U.S. 92, 87 S.Ct. 252, 17 L. Ed.2d 189. The defense there contended that this recent Supreme Court decision negates the government's argument in regard to the defendant's trial failure to file proper motions and that such case

The leading Second Circuit case of United States v. Spangelet makes clear that the defense does not have an automatic right to examine a grand jury transcript, even in an impeachment situation. *Spangelet*, describing the Second Circuit impeachment procedure, noted that "the district judge properly inspected *in camera* the grand jury minutes of Gaudin's testimony to see whether it conflicted with his testimony given at the trial" (258 F.2d at 341). It then held:

> And if no inconsistency had been shown, we agree that the proper procedure would have been that actually taken, namely, to deny the defendant access to the minutes and to order a copy thereof to be sealed and incorporated into the trial record for availability on appeal. (258 F.2d at 341).

The Second Circuit in *Spangelet* reversed the trial judge because he had failed properly to determine that inconsistencies in fact existed.

United States v. Giampa, 2 Cir. 1961, 290 F.2d 83, cited by *Dennis* in footnote 21 on page 874 of 384 U.S., on page 1851 of 86 S.Ct., illustrates the factual situation case in which the Court of Appeals agreed with the trial judge's determination that no inconsistencies in fact existed. The defense, under that factual situation, was not deprived of any right to examine the grand jury transcript because no such right, under those facts, exists. The conviction was therefore affirmed because the defense obviously could not have been prejudiced by being denied an examination of a grand jury transcript that, in fact, could not have been used for impeachment purposes because no inconsistencies in fact existed between the particular witness' trial and grand jury testimony.

*Dennis*' citation of *Giampa* directed specific attention to the following significant language on page 85 of that opinion:

> To avoid uncertainty in the future upon trials wherein this problem arises, certain fundamental principles should be observed. If the Government calls a witness who has given testimony before a Grand Jury, it is under a duty to have the transcript of such testimony available upon the trial. If it is then established at the trial that the witness has testified before the Grand Jury and defense counsel requests that the trial court examine the minutes for inconsistencies in testimony given upon the trial and before the Grand Jury, the trial court should read the minutes *and if inconsistencies be found should make such portions of the minutes available to defense counsel.* (290 F.2d at 85, emphasis ours).

United States v. Hernandez, 2 Cir. 1961, 290 F.2d 86, also cited in *Dennis*' footnote 21, presented, on its facts, the identical situation later presented in *Dennis*. Indeed, *Hernandez* anticipated *Dennis*, both in theory and in result, by six years. In *Hernandez*, as later in *Dennis*, the trial judge simply refused to order production of the grand jury transcript. And, as later was the case in *Dennis*, the

---

strongly supports defendant's position that *Dennis* relieved the defendant from any trial burden in that regard. *O'Connor* shows on its face that it involved an application of Tehan v. United States ex rel. Shott.

We thought that any question about whether there was a *Linkletter-Tehan-Johnson* question in this case had been laid to rest by the government's agreement with the defense's earlier stated position that such a question was not presented in this case. See G.B. 10/28/66, p. 1. Because the defense's letter of November 30, 1966 places that rare agreement between the parties in jeopardy, we expressly reject defendant's most recent argument and hold that the principles applied in O'Connor v. Ohio have no application to this case. As distinguished from Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, for an example, *Dennis* did not establish any new principle not theretofore announced in earlier Supreme Court decisions. Nor did *Dennis* overrule any Supreme Court case upon which defendant could properly rely as an excuse for its failure to move for relief in the trial court. See Donnell v. Swenson, W.D.Mo.1966, 258 F.Supp. 317, for this Court's application of the principles of the *Linkletter-Tehan-Johnson* trilogy in a State prisoner habeas corpus case where questions of retrospectivity are frequently presented.

trial judge also refused to conduct an *in camera* examination. *Hernandez,* applying the principles of *Spangelet* and citing the intervening Second Circuit cases of United States v. Zborowski, 2 Cir. 1959, 271 F.2d 661, and United States v. McKeever, 2 Cir. 1959, 271 F.2d 669, all of which cases were but applications of the principles established by the earlier Supreme Court cases subsequently applied in *Dennis,* held that it was "incumbent upon the trial court to inspect the minutes, as requested by the defendant, in order to ascertain whether any material inconsistencies existed" and that "[i]ts failure to do so requires that the conviction be reversed" (282 F.2d at 72).

■ The established Second Circuit impeachment procedure approved in *Dennis* has long recognized, consistent with the Supreme Court cases upon which it is based, that the defense has no absolute or automatic right to inspect a grand jury transcript even when use is sought for impeachment purposes. The defense, under the approved impeachment procedure, is entitled to examine and, still later, to use for impeachment if and when, but only if and when, the trial judge determines as a result of his *in camera* inspection that inconsistencies in fact exist between trial and grand jury testimony that could be used for impeachment of the particular witnesses involved.

*Dennis'* citation: "Cf. Fed.Rule Crim. Proc. 16(e), as amended in 1966; 18 U.S.C. § 3500(c)," (384 U.S. at 875, 86 S.Ct. at 1852), is one of the most significant citations in that opinion. The Supreme Court there directed attention to the established trial and appellate procedures of the Jencks Act which covers the production of all documents in the government's possession except grand jury transcripts. *Dennis'* compare citation to new Rule 16(e) makes clear that the effect of that new rule is to require that the

principles codified in the Jencks Act almost ten years ago now be followed in connection with a defendant's grand jury testimony now producible under new Rule 16(a) (3).[10]

This is not to suggest, however, that *Pittsburgh Plate Glass* was silently or in any other way overruled by *Dennis. Dennis* did not suggest, nor was it required to hold, that the Jencks Act now must be said to cover grand jury transcripts. The impeachment procedure approved in *Dennis* was established by the Second Circuit's application, on a case by case basis, of principles long established by the Supreme Court cases dealing with grand jury transcripts, including but not limited to *Pittsburgh Plate Glass. Dennis* applied those same principles to a factual situation comparable to *Hernandez* and reached exactly the same result as had been reached by the Second Circuit six years earlier.

*Dennis* recognized and approved the Second Circuit impeachment procedure in regard to the entire grand jury transcript that is now, for all practical purposes, codified in new Rule 16(e) as that rule relates to the "recorded testimony of the defendant before a grand jury," as provided in Rule 16(a) (3). *Dennis* also recognized that such procedure is quite comparable to the now familiar trial and appellate procedures of the Jencks Act. Those comparable procedures, consistent with all earlier Supreme Court decisions and with *Dennis,* recognize that the burden of showing a "particularized need" rests on the movant who would have a grand jury transcript produced for his examination.

Consistent with every Supreme Court case on the subject, *Dennis* recognized that the defense does not have a substantive right to inspect a grand jury transcript under any and all factual circumstances. The dissent in *Pittsburgh Plate*

---

10. This Court, prior to the promulgation of the new Rules of Criminal Procedure, routinely ordered upon proper motion the production and disclosure for defense inspection of a defendant's grand jury testimony in perjury cases. See, for example, United States v. Becker, D.C., 221 F.Supp. 950, and United States v. LaRocca, D.C., 219 F.Supp. 53, directing delivery to the defense of the transcript of all of each defendant's grand jury testimony, both orders entered April 18, 1963, shortly before the trial of *National Dairy.*

*Glass,* upon which the defendant so heavily relies in its postmandate argument, suggested that the ideal impeachment procedure to be followed by the trial judge would provide that *"when he [the trial judge] has satisfied himself* what part of the grand jury testimony covers the subject matter of the witness' testimony on the trial, * * * he [should then give] * * * that part to the defense" in order that "the defense may utilize the grand jury testimony *for impeachment purposes* as it may deem advisable in its best interests, subject of course to the applicable rules of evidence" (360 U.S. at 410, 79 S.Ct. at 1246, emphasis ours). The majority in *Pittsburgh Plate Glass* did not reach that question. The rationale of the majority opinion was entirely consistent with the dissent's suggestion (both opinions directed attention to *Spangelet),* again illustrating the fact that differences of opinion in the earlier Supreme Court opinions reflected disagreements over factual application of principles about which there was no real dispute.

· *Dennis,* consistent with the fundamental rationale of all the earlier Supreme Court cases, recognized that if the trial judge in fact orders the grand jury transcript produced and if the trial judge in fact properly makes his required *in camera* examination for inconsistencies and properly finds none, his refusal then to permit inspection of the grand jury transcript by the defense is also proper. A defendant, of course, has the right to test on appeal the question of whether the trial court's judgment on what is essentially a factual question in regard to the existence or nonexistence of inconsistencies was right or wrong. Concepts of fairness and justice require no more. If the appellate court agrees that no inconsistencies in fact existed, the conviction would be affirmed; if the appellate court does not agree with the trial court's factual *in camera* appraisal of the trial and

grand jury testimony, the case would be reversed and remanded.

The impeachment procedure approved by *Dennis* makes provision for the sort of "appropriate judicial safeguards" recommended by the strongest of advocates for expanded criminal discovery. See Brennan, Remarks on Discovery, 33 F.R. D. 56, at 65, cited in the Notes of Advisory Committee on Rules, to support Rule 16(e). Mr. Justice Brennan there advocated that "I would leave the primary responsibility with the trial judge under such guidance from appellate courts as may be necessary to mark its proper limits."

*Dennis* expressly reaffirmed the established principle of all the earlier Supreme Court grand jury transcript cases that it is "[t]he trial judge's function [to decide] whether a case has been made for production, and to supervise the process" (384 U.S. at 874, 86 S.Ct. at 1851). If we should read and apply *Dennis* as broadly as the defendant suggests we would miss the mark as far as United States v. Rosenberg, 3 Cir. 1957, 245 F.2d 870, missed when it applied *Jencks* to grand jury minutes. The Supreme Court accurately described the Congressional reaction to that Third Circuit decision in the course of deciding *Pittsburgh Plate Glass Co.*[11] Acceptance of defendant's argument that *Dennis* established that a defendant has a constitutional right to make a general inspection of a grand jury transcript without any showing of particularized need within the meaning of all the Supreme Court decisions and without any prior judicial supervision—a right much broader than any right recognized or established by *Jencks* and the Jencks Act—would, in our judgment, produce a reaction that would make that produced by *Rosenberg* seem mild. We reject defendant's argument that *Dennis* holds that a defendant has an automatic right to have a grand jury transcript produced for defense examination if and when the

11. See also the discussion of the Congressional reaction to improperly broad lower federal court applications of *Jencks* in Palermo v. United States, 360 U.S. 343, at 346 et seq., and at 363 et seq., 79 S.Ct. 1217, at 1221 and 1230 of Mr. Justice Brennan's opinion concurring in result.

government makes any use of that document; a right that clearly does not exist in regard to any other document in the government's possession.

*Dennis'* comment that "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact" and its comment that "[e]xceptions to this are justifiable only by the clearest and most compelling considerations" (384 U.S. at 873, 86 S.Ct. at 1851) must be read in context. Defendant's arguments attempt to push those comments into statements of constitutional axioms.

The state of the record forces the defendant to recognize that at trial the defense did not make any showing of particularized need. Defendant is therefore forced to base its postmandate argument upon its newest notion that *Dennis* somehow relieved the defense of all burden of showing any "particularized need." Defendant argues that *Dennis* commands that once the government made its showing of "particularized need" for refreshment, that *same* showing had the automatic effect of requiring inspection by the defense of the entire grand jury transcript. And all this without motions seeking such relief being filed. Defendant argues that *Dennis* commands that any government use of the grand jury transcript converted the entire grand jury transcript into the same status that pretrial depositions occupy in a civil case. Anything less, defendants argue, would deny the defense its alleged constitutional right of access to a "storehouse of relevant fact" (384 U.S. 873, 86 S.Ct. 1851).

■ *Dennis* did not overrule the principle stated in Gordon v. United States, 344 U.S. at 419, 73 S.Ct. at 373, that forbids a "broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up"—a principle which *Jencks* said "we reaffirm and reemphasize" (353 U.S. at 667, 77 S.Ct. at

1012). *Dennis* did not establish a new rule that there shall be discovery for the sake of discovery. Nor did *Dennis* even intimate that the price that the Government must pay for using grand jury transcripts in an attempt to refresh the recollection of a single witness is delivery of the entire grand jury transcript to the defense for its inspection. *Dennis* did not eliminate the established requirement that a movant, including a defendant, has the burden of demonstrating his own "particularized need" for production of the grand jury transcript in order that the trial judge may make an appropriate ruling as to whether portions should or should not be ordered disclosed under Rule 6(e) of the Rules of Criminal Procedure.

Defendant's extended argument that the factual situation in *National Dairy* is in fact similar to that presented in *Dennis* is based on the untenable theory that an impeachment and not a refreshment situation was involved in *National Dairy*. It is also based on the erroneous assumption that the defense in *National Dairy* was in fact denied the same motions for production and for *in camera* examination that were in fact filed and denied in *Dennis*. But even if defendant's assumptions could be considered to be valid, the record establishes that *National Dairy* presented on its facts an entirely different factual situation than that presented by the facts of *Dennis*. There was never any reason to assay the prior grand jury testimony of any *National Dairy* witness. No one ever suggested at trial nor does the defendant now suggest that any *National Dairy* witness' trial testimony was or might be inconsistent with his grand jury testimony.[12] The defendant has never intimated that there was or now is any reason even to suspect that inconsistencies might exist.

Our postmandate study of all the trial and all the grand jury testimony of all the witnesses involved establishes that

---

12. When we made inquiry in connection with that matter at oral argument, counsel for the defense assured us that "I

have no present evidence of any such thing at all" (O.A. Tr. 173).

such a suspicion would have been unfounded. In order to remove any conjecture and speculation about that question we find as a fact that no inconsistencies in fact exist in the trial and grand jury testimony of the *National Dairy* witnesses.

*National Dairy* was not a case where the charge could not be proved on the basis of evidence exclusive of the testimony given by the refreshment witnesses involved. The guilt or innocence of the defendants did not turn on the testimony of those witnesses. The testimony of those witnesses was corroborated by numerous other witnesses and by voluminous documentary evidence. If the testimony of the refreshment witnesses had been disregarded entirely on a motion to set the verdict aside on the ground of insufficiency of the other evidence, a fair appraisal of the record would have required that such a motion be promptly denied. We so find. No *National Dairy* witness made any admissions at trial that suggested to anyone that he may have testified inconsistently before the grand jury. Nor were the refreshment witnesses hostile to the defense. Indeed, it was obvious that each of the refreshment witnesses were reluctant to say anything that they believed would materially aid the prosecution. We so find those facts.

The fact *National Dairy* and *Dennis* are clearly distinguishable on their respective facts is not of paramount importance in this case. Acceptance of the defendant's invitation to debate that question involves an initial acceptance of defendant's basic contention that the principles applicable to impeachment and refreshment are identical and that the principles that regulate a proper refreshment procedure established in *Socony-Vacuum* must be considered to be "dead" in light of *Dennis*' discussion of the principles applicable to a proper impeachment procedure. We refuse to accept defendant's invitation because we believe that defendant's report of *Socony-Vacuum's* death is, in words attributed to Mark Twain, "grossly exaggerated," A. B. Paine, Mark Twain, a

Biography, Vol. II, p. 1039 (Harper's 1912). We turn now to that question.

## VI. Rejection of Defendant's Basic Argument In Regard to the Alleged Impact of Dennis on Socony-Vacuum

Defendant's basic argument, as it must, recognizes that both this Court and the Court of Appeals held that the principles established in *Socony-Vacuum* were properly applied in the trial of *National Dairy*. Defendant attempts to escape the force of those facts by contending that since *Dennis, Socony-Vacuum* is "dead" (D.B. 10/28/66, p. 21). Defendant attempts to argue that the Supreme Court's remand of *National Dairy* for "reconsideration in light of *Dennis* plainly constitutes a rejection of *Socony-Vacuum* as the rule for this case" (D.B. 9/26/66, p. 10).

We reject defendant's basic argument in regard to *Socony-Vacuum*. If the Supreme Court intended to overrule *Socony-Vacuum* in *Dennis* it would have expressly said so. There was no occasion for *Dennis* to do anything except cite *Socony-Vacuum* with approval because the principles there applied and those applied in *Dennis* are entirely consistent; the two cases, on their respective facts, simply applied different facets of consistent principle to entirely different factual situations.

*Socony-Vacuum*, on its particular facts, involved a case in which the trial judge had in fact ordered production and permitted the use of prior grand jury testimony for refreshment purposes alone. The defense was not permitted to examine the grand jury transcript at any time. *Socony-Vacuum* determined that "no iron-clad rule requires that opposing counsel be shown the grand jury transcript where it is not shown the witness" (310 U.S. at 233, 60 S.Ct. at 849). That case directed that federal trial judges design and follow "some appropriate procedure" to prevent the improper refreshment use of the produced grand jury transcript (310 U.S. at 233, 60 S.Ct. at 849). *Socony-Vacuum* reversed a Court of Appeals' determination that "the trial court committed prej-

udicial error in refusing to permit defense counsel to inspect the transcript of grand jury testimony used to refresh the recollection of certain witnesses" (310 U.S. at 231, 60 S.Ct. at 848). It expressly held that "refusal to make [a grand jury transcript used solely for refreshment purposes] available to counsel for the defense [cannot be said to be] *per se* reversible error" (310 U.S. at 234, 60 S.Ct. at 849).

The factual circumstances presented in *National Dairy* were substantially the same as those presented in *Socony-Vacuum*. The particular witnesses involved in *National Dairy* were either employees and officers of the defendant or were closely associated with the defendant; four of the seven *National Dairy* refreshment witnesses fell in this category. The remaining three *National Dairy* refreshment witnesses were officials of co-conspirators named in the indictment whose companies, along with the defendant National, are named in the numerous civil antitrust treble damage actions that still pend in this Court. The witnesses in *National Dairy* whose recollections the government sought to refresh were, as in *Socony-Vacuum*, hostile to the government's case, and were evasive and reluctant to testify. The testimony of those witnesses, together with the testimony of other witnesses similarly situated, formed the factual basis upon which defendant presented its various factual defenses to the jury. All those facts, as in *Socony-Vacuum*, were apparent to every one in the courtroom during the trial and clearly appear from a reading of the entire testimony of the seven *National Dairy* refreshment witnesses involved. We so find.

In *National Dairy*, as in *Socony-Vacuum*, the grand jury testimony was used for refreshment purposes only; in many instances, the refreshment incident ended by the witness merely saying that his recollection had not been refreshed. Appropriate safeguarding procedures were established and followed in both cases. The jury was repeatedly instructed in *National Dairy* that it could not consider the grand jury testimony as substantive evidence. We find that the trial testimony, refreshed or otherwise, and the prior grand jury testimony of each of the particular *National Dairy* refreshment witnesses was, in any event, either cumulative or dealt only with the minutiae of the conspiracy. We further find that the evidence in *National Dairy*, minus the testimony of the refeshment witnesses, clearly established all the facts necessary for proof of the conspiracy. We also find that the evidence of defendant's guilt in *National Dairy* did not in any way hang on any delicate balance, even if all such testimony be deleted in its entirety.

 The purpose of providing for an *in camera* examination of the *National Dairy* grand jury transcript was to enable the trial judge to rule the only two questions involved on the basis of the particular facts presented in regard to each particular witness. In order to prevent any possible abuse of the refreshment procedure, the trial judge was under duty to determine (a) whether particular grand jury questions and answers could fairly be said to be calculated to refresh a particular witness' recollection and (b) whether such questions were fairly selected in the full context of the particular witness' grand jury testimony on the particular subject of desired refreshment. The determination of those questions called for the exercise of judicial power and discretion; it did not involve the exercise of judgment on the part of defense counsel.

As a matter of sound general policy, trial judges seek and welcome the views of counsel for both sides before ruling on either preliminary questions of fact or on questions of law that are within the exclusive province of the trial judge. Defense counsel did not suggest at the time of the trial of *National Dairy* how their views on either of the two questions that we were required to decide *in camera* could be helpful in assisting us in the discharge of our judicial duties to be performed *in camera* under the safeguarding procedures that had been established

without defense objection. The Court of Appeals correctly determined that the defense "offered no objection to the procedure envisioned by the court," 350 F.2d at 331. We believe that it can fairly be said that defense counsel recognized that the trial judge's determination of such questions would be based on not uncomplicated assumptions of how the human mind works—assumptions that are not the subject of logical demonstration—and that presentation of argument would not, as a practical matter, be helpful to either the trial judge or to the defense. Cf. III Wigmore, § 755, page 100 (3rd Ed. 1940).

The rulings that we made *in camera* nevertheless were made on the assumption that the defense would contend that no set of grand jury questions and answers would in fact be calculated to refresh the recollection of any of the particular refreshment witnesses. We anticipated that such necessarily would be the defense position because it was and is obvious that the defense did not want the recollections of any of the seven refreshment witnesses refreshed on any subject that the government believed would aid the prosecution. It was and is equally obvious that the government would not seek refreshment on any subject it believed to be beneficial to the defense.

Counsel for the defense did not once object that we had erroneously permitted the use of a grand jury question and answer that was not fairly calculated to refresh the recollection of a particular witness. Had defendant believed that we had improperly permitted the use of any particular portion of the grand jury transcript in that regard we are certain that some objection would have been voiced at trial. No objection was made at trial on that score nor has any been made on that score since trial.

Objection at trial, of course, was not possible in regard to whether we had fairly determined that the questions and answers used in the courtroom were in fact fairly selected in light of the full context of the particular witness' grand jury testimony. But that fact does not mean that the defense was denied a fair trial.

We were convinced at the time of trial —and further consideration of this case in light of *Dennis* has not changed our mind—that all trial rulings made in connection with all trial *in camera* examinations of the grand jury transcript were subject to appellate review, so that the defendant would be ultimately protected against any prejudice that may have resulted from any of our rulings on the two questions presented for our determination in the refreshment procedure.

Our postmandate review of our trial rulings on both quesions, which included re-examination of the grand jury and trial testimony of every witness involved, convinces us that those rulings were fair and proper and that the defendant has no just claim that it suffered any prejudice by any of those rulings. We so find.

The question of whether we would handle a similar refreshment problem involving some future grand jury transcript in exactly the same way is not relevant to the question of whether the defendant in *National Dairy* was prejudiced in fact and law by the refreshment procedure followed in the trial of that case. Judges and lawyers not infrequently make their best rulings and finest arguments on their respective walks home from the courthouse immediately after the completion of the trial of a particular case. As a quite practical matter, it is improbable that either this or any other federal trial judge will be faced with precisely the same problem, at least in the form presented in the *National Dairy* trial. Under the new Rules of Criminal Procedure, as amended 1966, a federal trial judge now clearly has power to order production of all documentary evidence in the possession of the government at a pretrial conference. As a part of the pretrial proceedings, the trial judge may make an *in camera* inspection of the grand jury transcript. The judicial determination of whether disclosure and defense examination should be ordered can then be made under circumstances where

the practical trial pressure of keeping a jury in the box week after week will not be a factor militating against the design of further appropriate pretrial procedures under which the granting of inspection by the defense of all the produced refreshment data, including but not confined to the grand jury transcript, could be properly provided. We see no reason why motions alleging "particularized need" should not be set down for preliminary pretrial hearing under procedures not dissimilar to familiar Rule 41(e) motions.

This Court and the Court of Appeals followed and applied the principles of *Socony-Vacuum* to the trial of *National Dairy*. The Court of Appeals has determined that "no judicial abuse of discretion has been demonstrated," holding that:

> The inspection of grand jury minutes and the use of grand jury testimony have been permitted for the purpose of refreshing witnesses' recollections. United States v. Socony-Vacuum Oil Co., supra, (in which there were ninety instances when the Government used grand jury testimony to refresh recollection of witnesses); Cox v. United States, 284 F.2d 704, 706 (8 Cir. 1960). No iron-clad rule requires that counsel for the defense be shown the grand jury transcript where, as here, it is not shown to the witnesses and where, as here, an appropriate procedure is adopted and followed to prevent its improper use. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 233, 60 S.Ct. 811. In the final analysis, the question whether disclosure should be permitted is one addressed to the sound discretion of the trial court. Rule 6(e) F.R.Cr.P.; Pittsburgh Plate Glass Co. v. United States, supra, 360 U.S. at 399, 79 S.Ct. 1237. (350 F.2d at 331).

We note our agreement and determine independently that defendant's contention that *Dennis'* light requires this Court to hold that *Socony-Vacuum* is "dead" is not tenable. It follows that no *per se* reversible error can be said to have been committed in this case. See *Socony-Vacuum*, 310 U.S. at 234, 60 S.Ct. at 849. We further find and determine that the principles approved in *Socony-Vacuum* and all other Supreme Court cases dealing with grand jury transcripts, including *Dennis*, were properly applied to the facts presented in the trial of *National Dairy*, so that it can not be said that any error of any kind was committed in the trial of *National Dairy* in regard to the permitted use of the grand jury transcript for refreshment purposes.

An analogous application of the principles established in Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 would be required if it be assumed *arguendo* that some sort of error was committed by our refusal to permit the defense to inspect the particular portions of the grand jury transcript requested by it at trial. Both majority and dissenting opinions in *Rosenberg* agreed that failure to deliver a particular statement properly producible under the Jencks Act was harmless within the meaning of Rule 52(a) in a factual context in which a copy of that document in a different form had in fact been delivered the defense. The majority held "[n]o relevant purpose could have been served by giving petitioner's counsel a typewritten copy of a document which he had already been given in its original form, no advantage to the petitioner was denied by withholding it" (360 U.S. at 370, 79 S.Ct. at 1233). Mr. Justice Brennan, for the dissent, agreed that the harmless error doctrine was applicable to Jencks Act failures to produce; the dissent did not agree that the doctrine should be invoked in regard to all of the documents involved in that case. In regard to the failure to produce the document just mentioned, the dissent made clear its view that such failure was obviously a violation of the Jencks Act but that such failure could not be considered reversible error under Rule 52 of the Rules of Criminal Procedure. The dissent stated:

> The defense was not given a typed statement signed by Meierdiercks

which was discoverable under the statute, but this was harmless error since the defense was given a handwritten statement from which the typed statement had been copied. (360 U.S. at 377, 79 S.Ct. at 1237).

Cf. Palermo v. United States, 360 U.S. 343, at 364, 79 S.Ct. 1217 (opinion concurring in result). See also and compare United States v. LaRocca, W.D.Mo.1963, 219 F.Supp. 53, affirmed 8 Cir. 1963, 337 F.2d 39, in which we had occasion on ruling a motion for new trial to give further consideration to the Jencks Act question there involved in light of the second Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501, decided shortly after *LaRocca* had been tried.

Appropriate appellate review of our trial court rulings made in connection with our supervision of the refreshment procedure, assuming that the defendant properly preserved some appropriate appellate position, can not be made unless we follow the substance of the procedure now provided in Rule 16(e) of the Rules of Criminal Procedure. Our ruling denying defendant's motion to inspect the portions of the grand jury transcript that we examined *in camera* was certainly the equivalent of an order granting a protective order under that new Rule. We also believe the appellate procedure provided in Section 3500(c) of the Jencks Act is comparable. The spirit of *Dennis,* of 18 U.S.C.A. § 3500(c), of new Rule 16(e), and considerations of fairness and common sense, require that we seal and preserve in the record the appropriate parts of the grand jury transcript considered by this Court in the trial of *National Dairy* so that they will be available to the appropriate appellate court.

When we made inquiry concerning this matter at oral argument (O.A.Tr. 100–112, 115) the government indicated that it believed, subject to the Court's view, that the grand jury transcript should be made a part of the record (O.A.Tr. 117). Defendant's stated position was that it did not believe that making the appropriate portions of grand jury transcript

part of the record would serve any useful purpose because the defendant insisted that it was entitled to a new trial as a matter of right without any showing of prejudice (D.Memo. 11/9/66, p. 3).

Some question arose at oral argument in regard to the past and present location of the grand jury transcript (O.A. 100–112, 115). They were eventually located in the Department of Justice's files in Chicago and, at our request, forwarded to this Court pursuant to the government's letter of November 11, 1966, copies of which were sent defense counsel. Because defendant, in specific response to our inquiry, has taken the firm position that it is entitled to a new trial without any showing of prejudice and because it has stated that so far as its theoretical position is concerned, no useful purpose would be served by an examination of the grand jury transcript, our order will not provide for disclosure of the grand jury transcript to the defense pending appeal. Any occasion for further examination by either side will depend largely upon the next position the defendant may take in regard to the grand jury testimony. If defendant presents the same postmandate arguments on appeal that it has presented to this Court, the defendant would have no reason for wanting to make any examination of the grand jury transcripts.

Except for defendant's response to our specific inquiry, we would have ordered limited disclosure of the grand jury transcripts for examination by defense counsel for use on appeal. Under the circumstances, however, we leave the question of disclosure to the discretion of the appropriate appellate court.

ORDER

This Court, pursuant to the mandate of the Supreme Court, has given further consideration to this case in light of Dennis v. United States. For the reasons stated in this memorandum opinion and in accordance with the findings of fact and conclusions of law herein stated, all of which are incorporated in this order by this reference, it is

Ordered that defendant's postmandate motion for an order granting a new trial should be and is hereby denied. It is

Further ordered that the grand jury testimony of the witnesses listed in the government's letter to this Court of November 11, 1966 be sealed and made a part of the record of this case for transmittal to the appropriate appellate court in the event of further appellate proceedings in this case. The government's November 11, 1966 letter shall be attached to the box containing the grand jury transcripts for identification purposes. It is

Further ordered that disclosure of the sealed grand jury transcripts shall be subject to the order of the appropriate appellate court but that the seal shall not be broken except pursuant to an order entered either by that Court or by later order of this Court.